**WHOLE COURT**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 16, 2014**

# In the Court of Appeals of Georgia

A14A0297. THE STATE v. ALLEN et al.

PHIPPS, Chief Judge.

After police discovered marijuana in a car that was stopped for lane infractions, Patrick Scott and Dorian Allen, the driver and passenger, respectively, were indicted for the possession of more than one ounce of marijuana.[1] Scott and Allen moved to suppress the drug evidence as the fruit of an illegal seizure. The court conducted an evidentiary hearing, then granted their motion. The state appeals. For reasons that follow, we affirm.

The sole witness at the suppression hearing was the patrol officer who initiated the traffic stop. On direct examination, he testified to the following. On September 13, 2012, while stationed in the median of an interstate to monitor traffic, the officer

---

[1] See OCGA § 16-13-30 (prohibiting possession of controlled substances).

observed a 2012 Nissan Altima vehicle cross from the center lane of travel into "the fast lane." As the Altima passed the officer's stationary position, the officer saw the driver "pointing his finger all in the passenger's face." Concerned that the driver was distracted, the officer decided to catch up with the Altima. As he did so, the officer saw the Altima "make the same lane infractions again"; the officer also saw that the driver was "still reaching over with his fingers, pointing in the passenger's face." The officer initiated the traffic stop.

The officer walked to the Altima and informed the two occupants, appellees Scott and Allen, that they were stopped because of lane infractions. The officer asked them whether they were having an argument. Scott answered no, and stated that he was just talking to Allen. The officer advised Scott that he would be writing him a courtesy warning for the lane infractions. The officer obtained from Scott his driver's license and obtained from Allen a South Carolina identification card.

The officer perceived that Scott and Allen were nervous. Because of the lane infractions, the officer wanted to "see how [Scott] was on his feet" to "make sure he wasn't intoxicated." The officer asked Scott to exit the vehicle; Scott got out of the vehicle and walked to the location designated by the officer. The officer conducted

a pat-down search of Scott; after finding no weapon, the officer "engaged in general conversation with [Scott]" while he wrote the courtesy warning.

But after writing the warning, the officer did not thereupon hand it (along with the identifications) to Scott, who was standing beside him. Instead, as the officer testified,

> [O]nce I completed the warning I had dispatch check both of their driver's license[s]. Mr. Allen's was through South Carolina and Mr. Scott's was through Georgia. While waiting on returns from GCIC to come back, waiting on dispatch I had asked Mr. Scott for consent to search his vehicle. Mr. Scott wouldn't deny nor consent to a search.

The officer testified that Scott replied only that "you already got me stopped," and "[s]o at that time I had Mr. Allen exit the vehicle also and once Mr. Allen exited the vehicle I had them both stand at the front of my patrol car and I retrieved my K-9 partner Kazan out of the rear of my vehicle." When the officer walked the drug dog around the Altima, the dog showed a positive odor response. The officer put Kazan back into the patrol car, then began searching the Altima. While searching the interior of the vehicle, the officer received the requested GCIC information from dispatch; when the officer's search reached the trunk of the car, he discovered the marijuana.

3

An audio-video recording of the traffic stop was played at the suppression hearing.

On cross-examination, the officer provided additional details. He testified that, when talking to Scott and Allen as they sat in the Altima, he had looked at the vehicle's interior, but had seen neither marijuana nor any drug paraphernalia; and he had not detected the odor of marijuana. The officer stated that, when Scott complied with his directive to step outside the Altima, Scott continued to appear nervous, but showed "no signs of being intoxicated or impaired." The officer had concluded, "[Scott] wasn't intoxicated." Additionally, the officer agreed that "the courtesy warning was completed at that time as we see in the video . . . when [he] contact[ed] dispatch"; that "[a]fter [he] completed the warning" he "ran the license[s] at that point"; and that the "written warning was completed prior to [his] running the GCIC to dispatch."

On motion to suppress the evidence, Scott and Allen argued that the drug evidence was discovered only after the officer had unlawfully expanded the traffic stop. In its order ruling thereon, the court recited that it had considered, inter alia, both the officer's testimony and the recording. The court set forth the state's position that the extended detention was authorized by the officer's need to run a computer

4

check, then found, however, that "the officer did not begin this inquiry until . . . at the point when the officer had finished writing a warning citation for the traffic offense." The court also determined that it was the drug dog's response that provided probable cause to search the vehicle, but ruled that at the time the drug dog had so responded, Scott and Allen were being unlawfully detained – i.e., detained without any articulable suspicion of criminal activity. Citing *Weems v. State*,[2] the trial court granted the suppression motion. In three related claims of error, the state challenges this suppression ruling.[3]

In *Miller v. State*,[4] the Supreme Court of Georgia reiterated three fundamental principles that must be followed when conducting appellate review of a ruling upon a motion to suppress:

> First, when a motion to suppress is heard by the trial judge, that judge sits as the trier of facts. The trial judge hears the evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support [them]. Second, the trial court's decision with

[2] 318 Ga. App. 749 (734 SE2d 749) (2012).

[3] See OCGA § 5-7-1 (a) (4) (allowing the state to appeal "[f]rom an order, decision, or judgment suppressing or excluding evidence illegally seized").

[4] 288 Ga. 286 (702 SE2d 888) (2010).

regard to questions of fact and credibility must be accepted unless clearly erroneous. Third, the reviewing court must construe the evidence most favorably to the upholding of the trial court's findings and judgment.[5]

Further, the Court instructed, "To properly follow the first principle, [an appellate court] must focus on the facts found by the trial court *in its order*, as the trial court sits as the trier of fact."[6]

Here, the trial court explicitly included in its order this pertinent finding: "the officer did not begin this inquiry [the computer check at issue] until . . . the point when the officer had finished writing a warning citation for the traffic offense." This finding must be accepted, as there was evidence adduced at the hearing that supported it.[7] For instance, as detailed above, the officer unequivocally testified so.[8] Moreover, the audio-video recording of the traffic stop supports the officer's account. Construed most favorably to the upholding of the trial court's findings and grant of the

---

[5] Id. at 286 (1) (citation and footnote omitted).

[6] Id. at 287 (1) (emphasis in original).

[7] See id.

[8] See generally *Salmeron v. State*, 280 Ga. 735, 737 (1) (632 SE2d 645) (2006) (citing the officer's unequivocal testimony as support for the trial court's finding).

6

suppression motion,[9] the evidence showed that, before initiating the computer check, the officer had concluded the tasks related to the investigation of the lane infractions, including a determination that the driver Scott was not intoxicated. The officer, therefore, lacked articulable suspicion of any drug (or other) crime, as the officer's perception that Scott and Allen were nervous "did not support a finding of reasonable, articulable suspicion that would have justified prolonging the detention."[10]

As a general rule, an investigatory stop is not unreasonably prolonged by the time necessary to run a computer check.[11] But it does not necessarily follow that an officer may *initiate* a computer check *after* completing the investigation into the basis

---

[9] See *Miller*, supra at 286 (1).

[10] *Nunnally v. State*, 310 Ga. App. 183, 187 (2) (713 SE2d 408) (2011); see *Bell v. State*, 295 Ga. App. 607, 609-610 (2) (672 SE2d 675) (2009) (holding that nervousness, perceived from driver's refusal to make eye contact with officers, together with driver's "dry mouth," did not constitute a particularized and objective basis for officers to suspect that motorist possessed contraband); *Payne v. State*, 244 Ga. App. 734, 739-743 (4) (5) (536 SE2d 791) (2000) (deputy's testimony — that the stopped driver, inter alia, was nervous, had "shaking" hands, dropped items from his wallet, would not "look me in the eye," and was "shuffling around" — showed no particularized and objective basis for suspecting that driver was, or was about to be, engaged in criminal activity; thus, driver's detention was unlawful).

[11] *Hayes v. State*, 292 Ga. App. 724, 729 (2) (b) (665 SE2d 422) (2008).

for the traffic stop.[12] Further, a police officer may check "for outstanding warrants or criminal histories on the occupants of a vehicle at a valid traffic stop" based upon concerns for officer safety "as long as under the circumstances they do not *unreasonably prolong* the stop."[13] But "[o]nce the tasks related to the investigation of the traffic violation and processing of the traffic citation have been accomplished, an officer cannot continue to detain an individual without articulable suspicion."[14]

> A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time to complete that mission. The officer's purpose in an ordinary traffic stop is to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with the intent to issue a citation or

---

[12] Cf. *St. Fleur v. State*, 296 Ga. App. 849, 851 (1) (676 SE2d 243) (2009) ("In this process [of writing a warning], the officers checked [the driver's] identity with a dispatcher."); *State v. Williams*, 264 Ga. App. 199, 205 (509 SE2d 151) (2003) ("[T]he computer checks run by the officer were diligently pursued during the course of a valid traffic stop.").

[13] *Matthews v. State*, 294 Ga. App. 836, 840 (1) (d) (670 SE2d 520) (2008) (citation and punctuation omitted; emphasis supplied).

[14] *Weems*, supra at 752 (1) (citation and punctuation omitted) (finding that "[t]he officer had completed the tasks related to the investigation of the traffic violation of following too closely and had written the courtesy warning," and, having completed the investigation related to the traffic stop, "to legally expand beyond the original investigation of following too closely and the issuance of the warning, the officer had to show that he had articulable suspicion of other illegal activity").

8

warning. Once the purpose of that stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention.[15]

Accordingly, the evidence here showed that the officer – having accomplished the tasks related to his investigation into lane infractions[16] and having no reasonable, articulable suspicion of criminal activity aside from the traffic violation – unreasonably prolonged the duration of the traffic stop when he initiated the computer check.[17]

---

[15] *Salmeron*, supra at 736 (1) (citation and punctuation omitted).

[16] See, e.g., *Rosas v. State*, 276 Ga. App. 513, 517 (1) (c) (624 SE2d 142) (2005) (finding that "[a]n officer who lacks reasonable suspicion of other criminal activity exceeds the scope of a permissible investigation of a traffic offense only if he continues to detain and interrogate the subject, or seeks consent to search, after the conclusion of the traffic stop or after the tasks related to the investigation of the traffic violation have been accomplished"); cf. *Young v. State*, 310 Ga. App. 270, 273-274 (712 SE2d 652) (2011) (finding that "because the officer's suspicions were piqued by his observations of the truck's condition, the strong scent of perfume emanating from the cab," the passenger's demeanor, and the driver's response to questioning, the investigating officer was prompted and authorized to request a K-9 unit and to run criminal histories on both the driver and the passenger).

[17] See *Weems*, supra (officer had no reason to continue to detain driver, "particularly since he had already written [the driver] a warning citation before he inquired into other criminal activity").

9

The foregoing, governing principles were recently reinforced by the Georgia Supreme Court's decision in *Rodriguez v. State*,[18] which recited:

> In some cases, a detention is prolonged beyond the conclusion of the investigation that warranted the detention in the first place, and in those cases, the courts generally have concluded that such a prolongation – even a short one – *is* unreasonable, *unless*, of course, good cause has appeared in the meantime to justify a continuation of the detention to pursue a different investigation.[19]

Construing the evidence in the instant case most favorably to the upholding of the trial court's findings and judgment, the investigation that warranted the detention in the first place – for lane infractions – had concluded. And there was no evidence that any "good cause . . . appeared in the meantime to justify a continuation of the detention in order to pursue *a different investigation*"[20] – that began when the computer check at issue was initiated.[21] (No evidence was adduced, and no argument

---

[18] __ Ga. __ (___ SE2d ___) (2014) (Case No. S13G1167, decided June 30).

[19] Id. at __ (2) (b) (emphasis supplied).

[20] Id. at __ (2) (b) (emphasis supplied).

[21] See generally footnote 15, supra, and the text it accompanies.

10

has been made, that the computer check was intended to aid the officer in determining whether lane infractions had occurred.)

Finally, although the ultimate conclusion in *Rodriguez* was that the drug evidence was admissible, the analysis employed by the Court is illustrative as demonstrating adherence to and application of the above-cited governing principles – the *Rodriguez* Court considered whether the evidence, when construed most favorably to the upholding of the trial court's findings and judgment, supported the trial court's suppression ruling that the computer check was initiated during a lawful detention.[22] In that case, the car driven by Rodriguez, who was accompanied by a passenger, was stopped by police for the purpose of investigating the whereabouts of a man with an outstanding warrant, "Enrique Sanchez."[23] The police found drugs in Rodriguez's car, giving rise to the criminal prosecution, during which Rodriguez moved to suppress the drug evidence, but the trial court denied her motion.[24] The question presented by that case was whether the detention was unreasonably

---

[22] Accord *Salmeron*, supra.

[23] *Rodriguez*, supra at __ (2) (b).

[24] Id. at __.

11

prolonged by certain identification inquiries, including a computer check.[25] The Court answered that question in the negative.[26]

In reaching its conclusion, the *Rodriguez* Court made clear that it was construing the evidence most favorably to support the findings and judgment of the trial court in that case – the *denial* of the accused's suppression motion.[27] Further, the *Rodriguez* Court explained that the inquiries and computer check at issue did not constitute a different investigation, but were related to the investigation of the basis for the traffic stop:

> [T]hese additional inquiries to which Rodriguez objects were *not* altogether unrelated to the investigation of Sanchez and his whereabouts. Ascertaining and verifying the identities of the women in the car were minimally intrusive means of confirming that neither was the "Enrique Sanchez" for whom the officer was looking. . . . The additional inquiries [and computer check] were *not* altogether unrelated to the justification for the traffic stop.[28]

---

[25] Id. at __ (2) (b).

[26] Id. at __ (2) (b).

[27] Id. at __ (2) (b).

[28] Id. at __ (2) (b) (emphasis supplied).

12

The *Rodriguez* Court – having determined that the inquiries and computer check were not a different investigation, but part of the original investigation (that formed the basis of the stop) into the whereabouts of "Enrique Sanchez" – then cited "officer safety" as an alternative basis for affirming the denial of Rodriguez's motion to suppress.[29] Indeed, reliance upon "officer safety" *presupposes* that the officer is engaged in the *lawful* discharge of his duties.[30]

The evidence in the instant case, when construed most favorably to the upholding of the trial court's findings and judgment *granting* the accused's suppression motion,[31] shows that the officer had concluded his investigation that warranted the detention in the first place; that the computer check *initiated* thereafter was not related to the investigation of the basis for the stop (lane infractions); and that no good cause had appeared in the meantime to justify a continuation of the detention while the officer pursued a different investigation (that began when the computer check was initiated). The continued detention – even if a short one – beyond the

---

[29] Id. at __ (2) (b).

[30] See id. at __ (2) (b) (noting principle that "[c]hecking for outstanding warrants or criminal histories on the occupants of a vehicle at a *valid* traffic stop is justified by concern for the officer safety *during* the stop") (emphasis supplied).

[31] See *Miller*, supra.

13

conclusion of the investigation that warranted the traffic stop in the first place was therefore unreasonable. Because the officer was not authorized to initiate a different investigation during that unlawful detention, it cannot be said that he was then engaged in the lawful discharge of his duties; "officer safety," thus, cannot serve as justification for the computer check or for the unlawful detention. Notably, the officer did not testify, nor did the prosecutor argue before the trial court, that officer safety played any role in the computer check, the prolonged detention, or the search for drugs in the Altima.

Given the foregoing, the state has demonstrated no basis to disturb the order granting Scott's and Allen's motion to suppress the drug evidence. When the evidence is viewed most favorably to the upholding of the trial court's findings and judgment, the trial court was authorized to conclude that the drug evidence was discovered as a result of an unconstitutional seizure.

In concluding otherwise, the dissent states that it is relying *solely* on the audio-video recording, and – after assessing those facts de novo[32] – details a series of actions taken by the officer *before* he completed the written warning, then asserts that

_____

[32] But see *Miller*, supra at 286 (1) (clarifying "fundamental principles which must be followed when conducting an appellate review" of suppression rulings).

14

the officer initiated the computer check "[w]hile still speaking with Scott about the nature of the warning." Despite this broad characterization of the officer's conduct, what the recording specifically shows is the officer volunteering what he had already said to the driver Scott minutes before – that he was issuing a courtesy warning, not a ticket.[33] But more importantly, as the trial court found (and as the officer testified and as the recording shows), at the time the officer initiated the computer check, he had already completed the written warning; rather than giving the completed warning to the driver and allowing Scott and Allen to leave, the officer prolonged the detention by initiating the computer check – which check had nothing to do with the purpose of the stop: to investigate lane infractions. Finally, as the recording confirms, after initiating the computer check, the officer engaged in nothing relating to the investigation of the lane infractions. Indeed, the dissent cites nothing. As *Miller* cautions: A reviewing court violates a "principle of appellate review by focusing on its own assessment of the facts, rather than the facts set forth by the trial court."[34]

> On numerous occasions the appellate courts of this state have invoked
> [the fundamental principles of appellate review explained in *Miller*] to

---

[33] See generally footnote 15, supra, and the text it accompanies.

[34] *Miller*, supra at 289 (2).

affirm trial court rulings that upheld the validity of seizures. These same principles of law apply equally to trial court rulings that are in favor of the defendant and their application to this trial court's order . . . demand[s] that the court's order be affirmed.[35]

*Judgment affirmed. Barnes, P.J., Ellington, P.J., and McFadden, J., concur.*

*Andrews, P.J., and Ray and McMillian, JJ., dissent.*

---

[35] Id. at 286-287 (1) (citation omitted).

16

A14A0297. STATE v. ALLEN et al.

MCMILLIAN, Judge, dissenting.

I respectfully dissent because I believe that the majority improperly focuses on the officer's testimony to conclude that the stop was completed at the time he contacted dispatch to run the computer check. In doing so, the majority applies an overly formulaic test and mistakenly ignores the objective facts surrounding the stop. While I agree that credibility determinations made by a trial court must be accepted unless clearly erroneous, I find that the controlling facts in this case are undisputed because they are plainly discernable from the patrol car-mounted video recording, and this Court should therefore review those facts de novo. See *Johnson v. State*, 299 Ga. App. 474, 474-475 (682 SE2d 601) (2009). Moreover, even if I were persuaded by the majority's characterization of the officer's testimony, "[t]he officer's subjective belief that he lacked authority to detain [defendants] for continued investigation does not control where the facts objectively show the officer had such authority." *Cole v. State*, 254 Ga. App. 424, 426 (2) (562 SE2d 720) (2002).

Here, the recording clearly shows that the stop had not yet been completed. Approximately seven minutes after the camera began recording, Officer Jackson

returned to the front passenger window to ask Allen for his current address to include on the written warning. One minute later, he returned to the front of his patrol car where Scott was waiting and continued writing the warning and answered additional questions from Scott. While still speaking with Scott about the nature of the warning and with the warning still in his hand, Officer Jackson contacted dispatch via the radio on his lapel to ask for a computer check of Scott's license and Allen's identification card.

> It is well-established law that a valid traffic stop
>
> includes the time necessary to verify the driver's license, insurance, registration, and to complete any paperwork connected with the citation or written warning. *A reasonable time also includes the time necessary to run a computer check to determine whether there are any outstanding arrest warrants for the driver or the passengers.*[1]

(Citations omitted; emphasis in original.) *Matthews v. State*, 294 Ga. App. 836, 838 (1) (670 SE2d 520) (2008). Moreover, I am not aware of any controlling authority that would require officers to initiate a computer check at a specific point within a valid, ongoing traffic stop. Nor am I aware of any authority that would require an

---

[1] Unlike the majority, I am not persuaded that a computer check must be directly related to the reason for the investigative stop in order to find that continued detention is warranted to complete the check.

2

officer to proceed in the most expeditious manner possible, as determined by a court after the fact.

Rather, as the United States Supreme Court has cautioned,

[a] creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But the fact that the protection of the public might, in the abstract, have been accomplished by "less intrusive" means does not, by itself, render the search unreasonable.

(Citations and punctuation omitted.) *United States v. Sharpe*, 470 U.S. 675, 686-687 (II) (B) (105 SCt 1568, 84 LE2d 605) (1985). In *United States v. Brigham*, the en banc Fifth Circuit emphasized that "[t]here is . . . no constitutional stopwatch on traffic stops" and, noting the Fourth Amendment touchstone of reasonableness, declined to impose a particular sequence or constitutionally mandated protocol on questioning and computer checks during traffic stops. 382 F3d 500, 511 (5th Cir. 2004).

As the majority notes, our Supreme Court recently provided additional guidance on this very issue in *Rodriguez v. State*, __ Ga. __ (Case No. S13G1167, decided June 30, 2014). The Court explained that there are two different types of

claims that a detention was unreasonably prolonged – those in which a detention is allegedly prolonged beyond the conclusion of the investigation that warranted the detention and those in which the investigation itself purportedly took too long. Id. at __ (2) (b). In rejecting Rodriguez's claim that her detention was prolonged beyond the conclusion of the officer's investigation into the reason for the stop, the Court found that, although he may have gathered some information that might have dispelled the original impetus for the stop, "the officer had done or said nothing at that point to indicate to the women that his investigation of [the reason for the stop] was concluded." Id.

Turning to the second type of prolonged detention, the Court emphasized that, although the length of the prolongation is not itself dispositive, the officer's additional actions prolonged the detention for only a couple of minutes at most. *Rodriguez*, __ Ga. __ (2) (b). "So long as an officer pursues his investigation with reasonable diligence, the Fourth Amendment is not offended." Id. ("[T]he police are not constitutionally required to move at top speed or as fast as possible. At a traffic stop, the police can occasionally pause for a moment to take a breath, to think about what they have seen and heard, and to ask a question or so.") (citation and punctuation omitted).

Here, although Officer Jackson may have completed the physical writing of the warning, as in *Rodriguez* and unlike in *Weems*, the traffic stop had not yet concluded. See *Rodriguez*, __ Ga. at __ (2) (b), n. 13 ("'Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave.'") (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (II) (B) (129 SCt 781, 172 LE2d 694) (2009)). Officer Jackson had inquired and obtained identity information from Allen and Scott prior to writing up the warning, and as he was finishing the warning, the video shows that Officer Jackson called in the identification information that he had previously obtained. Therefore, the stop was not prolonged beyond the conclusion of Officer Jackson's investigation into the stop.

Nor was the investigation itself unreasonably long. The record shows that at the time Officer Jackson's K-9 alerted to the presence of narcotics, the stop had been extended by only three minutes. See *Rodriguez*, __ Ga. at ___ (noting with approval an Eleventh Circuit case holding that a request for criminal histories as part of a routine computer check is justified for officer safety and that such a check is reasonable even if it extends the stop for three minutes beyond what was necessary to complete the investigation that justified the stop).

5

Based on the totality of the circumstances and the particular facts of this case, I do not find Officer Jackson's actions to be unreasonable or that he unlawfully detained Appellees. See *Young v. State*, 310 Ga. App. 270, 273-274 (712 SE2d 652) (2011) (finding no unlawful detention where officer's sequence of actions were to first request relevant paperwork, ask the driver to step out of the vehicle, engage him in conversation, and then request a K-9 unit before contacting dispatch to run a computer search on the driver's and passenger's criminal histories); *Hall v. State*, 306 Ga. App. 484, 486 (2) (702 SE2d 483) (2010) (because the officer requested consent to search before he received verification on the driver's license, the request for consent occurred before the purpose of the traffic stop was fulfilled); see also *Bowens v. State*, 276 Ga. App. 520, 521 (623 SE2d 677) (2006) (traffic stop was not prolonged by the dog's free air search where the stop was still in progress because the officer was running a computer check on the driver's license and registration). I would therefore reverse the judgment of the trial court granting the Appellees' motion to suppress.

I am authorized to state that Presiding Judge Andrews and Judge Ray join in this dissent.